THE PEOPLE, on the relation of Munson I. Lockwood, *vs.* WILLIAM W. SCRUGHAM.

Prior to the passage of the militia law of 1846, L. was brigadier general of the 15th brigade. Under that law, as senior officer, he became entitled to command one of the new brigades. By the militia act of 1847, the 15th brigade district was modified, and L. was assigned to the command of a brigade district numbered as the 7th, by a general order dated June 9th, 1847. On the 5th of May, 1855, the commander-in-chief revoked the order of June 9th, 1847, and appointed S., who was senior colonel in the brigade, to the office of brigadier general, and directed him to assume the command of the brigade. On an application by L. for a mandamus, to be directed to S., commanding him to permit the relator to exercise the said office of brigadier general, without interruption or intrusion from or by the defendant;

*Held,* 1. That the governor, as the commander-in-chief of the militia, being the supreme head of the military forces of the state, to whom the relator, and every other subordinate officer owed obedience, and whom the constitution and laws had made the ultimate judge of every disputed election in the militia, the court had no right to review, upon an application for a mandamus, the general order made by him on the 5th of May, 1855, assigning to S. the command of the 7th brigade.

2. That so long as that part of the order which countermanded the order of June 9, 1847, assigning the command of the 7th brigade to L. remained operative, the relator could not exercise the command of such brigade; and it was therefore immaterial whether S. could do so or not.

3. That the relator having been deprived of his command by the order of his superior, and not by any act of S., if he could be reinstated in his command at all, it must be upon application to another tribunal, and not by a mandamus issuing out of this court. S. B. STRONG, P. J., dissented.

*It seems* that the order of the commander-in-chief, depriving the relator of his command, was right, and warranted by the laws and the constitution of the state. *Per* BIRDSEYE, J.

APPEAL from a decision made at a special term, granting a peremptory mandamus. For a report of the case below, see 20 *Barbour,* 302, where the facts are fully stated.

*Ralph Lockwood,* for the relator.

*John Thompson,* for defendant, and the defendant in person.

*By the Court,* BIRDSEYE, J. The counsel for the defendant contends that this proceeding is merely to try the validity of

The People *v.* Scrugham.

the commission issued to the defendant, as brigadier general of the seventh brigade ; and that we as a civil court, have no jurisdiction to adjudicate upon any such matter; and that, even if we have such jurisdiction, we cannot, and if we can, we ought not to exercise it, by the writ of mandamus.

At a first view it would seem that we must decide upon the defendant's title to his office, before we can dispose of this case. And that was done by the judgment of the special term. But, upon a closer examination, and for reasons which will appear further on, I think that question is not necessarily involved in this case. I decline, therefore, to express here any opinion whether our jurisdiction would, on the writ of mandamus, extend so far as to pass upon the title to this office, or whether the party aggrieved must resort to proceedings known to the military law, as by complaint to the commander-in-chief, or by applying for a court of inquiry, or a court martial, or otherwise ; or whether relief might be had at our hands, by an action in the nature of a *quo warranto*, under § 432 of the code.

The argument as to the consequences of the clashing of jurisdictions which might follow from our passing on the defendant's title to his office in this proceeding, is certainly a very strong one. The judgment of the special term leaves the defendant in the nominal possession of his office, subject to its burdens and duties, still owing obedience to his superior officers, and liable to discipline at their hands in case of disobedience. His commission is not revoked. The judgment appealed from does not, and could not, declare it to be void ; though in the opinion of the court below, it is said to be null and void. But while the judgment appealed from, relieves the defendant from none of the obligations of his office, it restrains him from the exercise of its duties, on the ground that his appointment was unauthorized and void. To whom shall the defendant render obedience ? To this court ? Then a court martial may punish him for disobeying the orders of his commander-in-chief. Shall he obey the orders of his military superiors ? He will do so only at the hazard of incurring punishment from this court, for contempt of its judgment and its writ of peremptory mandamus. Although

the title to the defendant's office does not necessarily arise in this case, I think these considerations will be found pertinent to the point which is actually presented for adjudication. What that precise point is, will best appear from a statement of the recent statutory provisions in relation to the state militia. Those provisions are numerous, and, at first sight, not quite congruous, as they certainly are not very interesting to civilians. But it is believed that a little care and attention will remove the apparent incongruity, and that an examination and collation of these statutes will disclose the difficulty under which the relator labors, as well as present the only argument which the case requires.

Three facts are alleged, if I correctly apprehend the relator's case, as the basis of his application for relief. The alternative mandamus avers, by way of recital, that in the year 1841, the relator was duly elected brigadier general of the 15th brigade of the militia, and was also thereafter duly *appointed* as the senior brigadier general to the *command* of the 7th brigade in the second division of the militia, under the act passed in the year 1847, constituting the said brigade. The writ next avers that the relator, ever since that appointment, has been, and still is, rightfully entitled to hold, use and exercise the said office and command, and ought now to be permitted to exercise the said office, and to hold and retain the sole command as brigadier general of the same. The writ also avers that the defendant has claimed, intruded into, and unlawfully assumed and exercised said office of brigadier general, without any legal election, appointment, warrant or authority, and refuses to desist therefrom. If an investigation of the case showed that the truth or falsity of this last allegation must be tried, then the precise point urged by the defendant, as above adverted to, would arise; we should then be compelled to pass directly upon the relator's title to his office. Before doing that, we should need to examine the grounds and extent of our jurisdiction to award, upon mandamus, the relief sought by the relator. As already stated, in my opinion this question is not necessary to be passed upon here, though

The People v. Scrugham.

counsel on both sides assume and insist that it is presented, and must be decided.

As to the question of jurisdiction, I shall only remark that so far as my knowledge extends, or as appears from the arguments or authorities cited at the bar, this is the first case in which a civil court was ever called to pass upon any such question. Heretofore, if similar disputes have arisen, they have been settled by the military tribunals. Until now no complaint has been made that those tribunals lack either the power to dispose of such questions, or the impartiality requisite to dispense exact justice between the parties. By the revised statutes relating to the militia, (1 *R. S.* 294, § 2,) the commander-in-chief might, subject only to the provisions of the laws of the United States, arrange, alter, divide, annex and consolidate the divisions, brigades, regiments, squadrons, troops and companies of the militia in such manner as in his opinion the proper organization of the same should require. By the report of the adjutant general, A. C. Niven, made in January, 1845, it appears that the divisions, brigades and regiments of militia in this state, then in existence, were as follows, viz: of cavalry, 4 divisions, 8 brigades, 27 regiments, and 2 squadrons; of artillery, 4 divisions, 8 brigades, 1 brigade of horse artillery, 30 regiments, and 1 battalion; of riflemen, 3 divisions, 7 brigades, and 22 regiments; of infantry, 33 divisions, 66 brigades, 273 regiments, and 9 battalions. There were, then, 44 military divisions, 90 brigades and 352 regiments, commanded respectively by as many major generals, brigadier generals and colonels. On the 13th of May, 1846, an act was passed to provide for the enrollment of the militia, and for other purposes. (*See Laws* 1846, *ch.* 270, *p.* 346.) By the third section of this act it was provided that the commander-in-chief should divide the state into eight military division districts. Each district was to be divided into two brigades, and the brigades into regimental and company districts. The necessary effect of this act was to abolish at once 36 of the division districts, and 74 of the brigade districts, which had previously existed. In case by the alteration of the districts several officers of the same grade should be found in any new district, (as must

certainly be the case in most if not all the new districts,) the law provided that the officer highest in rank was to take command; in case of equality in rank, rank was to be determined by casting lots. The officers, other than such as should have commands, were to be exempt from doing any military duty, except in war and insurrection, but were to be entitled to all the privileges then provided by law.

This act contemplated a new enrollment of the militia, but made no new provision for the election of officers, except as to the new companies to be formed. Pursuant to its provisions the state was divided into division and brigade districts, but before the enrollment required by the law was completed, the constitution of 1846 was adopted. Although the principal provisions of the old constitution, touching the state militia, were embodied in the new one, the method of appointing some of the officers was changed. Probably this fact, together with the incompleteness of the act of 1846, to answer fully the purposes of its enactment, led to the passage of the act of May 13th, 1847, to provide for the enrollment of the militia, and to encourage the formation of uniform companies, &c. (*Laws* 1847, *ch.* 290, *p.* 355.) Both these acts contemplate nothing less than the entire abrogation of the previously existing militia system of the state, and the substitution, in its stead, of one radically different. The former law was compulsory, and brought into service all persons between the ages of 18 and 45, not exempt from military duty. (1 *R. S.* 285, § 1.) The laws of 1846 and 1847, and all the subsequent statutes, provide for organizing a volunteer force only. A great reduction of the force was the necessary consequence of the alteration. The change is so sweeping as to amount in fact to an annihilation of the old system. The act of 1847 provides, (§ 3,) that the military division districts, made in pursuance of the act of May 13, 1846, should be and remain the military division districts of the state, subject, however, to such alterations, as the commander-in-chief should see fit to make. And the commander-in-chief was to nominate, and with the consent of the senate, to appoint and commission some suitable person residing in each of said division districts, (except the

first,) to *fill the office* of major general for such districts. The persons so appointed and commissioned were to have the command of the militia of the division district, for which they should be so appointed. And each of said persons, who should at the time of their appointment hold the rank of major general, was to take rank from the date of his first commission. Each of the division districts was to be divided into four brigade districts, (§ 4,) instead of two as provided by the act of 1846. The act then proceeds, (§§ 5–23,) to provide for the organization of the new brigade districts, and the regiments and companies therein, and for the election of the officers of companies by the members of the companies, and of regimental officers by the officers of companies, and of the brigadier general and brigade inspector by the field officers of regiments. The several classes of officers thus elected were then to be commissioned by the commander-in-chief, (§ 23,) and thereafter were to discharge all the duties attached to their respective offices.

It was at this point, and only upon the completion of this process of electing and commissioning the entire new set of officers, that the organization of the newly formed brigade district was to become complete. No subsequent statute has altered these prerequisites to the organization of the brigades, except that since the act of 1849, regimental elections may be held as soon as six uniformed companies are organized in the regimental district, instead of eight as under the act of 1847. If in any brigade of the state, the necessary company, regimental and brigade officers have not yet been elected and commissioned, then that brigade is "not organized" within the provisions of law hereafter referred to. Such, it will appear, was the condition of the seventh brigade, under the command of the relator, at the time of the alleged appointment of the defendant. It was obvious, however, that during this process of electing and commissioning the new officers of the new brigades, the duties which after their election were to devolve upon them, must be temporarily performed by some other persons. Otherwise no new elections could be had, and the militia, instead of being newly enrolled, would be wholly disorganized. Accordingly it

was provided by § 5 of this act of 1847, that "*the command of each of said brigade districts*" should be assigned by the commander-in-chief to the brigadier general residing in each of said districts respectively, highest in rank, who was in command on the first day of November, 1846, and who had performed certain specified services. The officer thus assigned to the command was then to divide his brigade district into two regimental districts, according to population, and cause the boundaries thereof to be filed in the adjutant general's office. By § 6, similar provisions were made for assigning " the *command* of each of the said regimental *districts*" to a colonel possessing the same qualifications as are required in the previous section, in reference to the brigadier general, and for the division of each regimental district into eight company districts. The formation of these regimental and company districts, it will be seen from the law, was indispensable to the election of the new officers, and the organization of the new brigade. Section 24 of the same act provides for the designation by the commander-in-chief, in each of the newly formed company districts of the several regiments, of one captain, one first and one second lieutenant, from the officers in commission on the 1st of November, 1846, as the company officers of the district, who, when so designated, were to "*have the command*" not merely of the *district,* as was the case in § 5 as to the brigadier generals, but of all the ununiformed militia in the district, and were to discharge the duties specified until a uniform company should be organized in the district, in conformity to the provisions of the act, when their duties were to cease. The seventh brigade district was formed pursuant to the provisions of this act, and the relator was found to possess the qualifications for its command specified in § 5 of the act. Accordingly the commander-in-chief, by a general order, on the 9th of June, 1847, assigned to him the command of the seventh brigade. It is, in substance, of the loss of this "command" that the relator complains, as will appear hereafter.

By § 4 of the act, a person was to be appointed and commissioned in each of the new division districts " to fill the office of

The People *v.* Scrugham.

major general for such district," even if the former major general still continued to reside therein, and might have filled the office. But as to the brigade districts, no person was to be appointed "to fill the office" of brigadier general; but the "command" of the district was to be assigned to some of the officers then in commission, and full provision was made for the election of a brigadier general, who was then to assume the command of the brigade. The same distinction runs through the whole statute, and all the subsequent statutes touching the militia. It is obvious, not merely from the provisions cited, but from the whole frame of the act of 1847, that the "command" thus "assigned" to the relator was a mere temporary function, to subserve a particular purpose, viz. the organization of the new brigade, and to cease when that brigade had, as required by both the law and the constitution, elected its own general. This "command" was not the relator's *office*, as brigadier general, nor essential to the existence or continuance of that office. He could be deprived of the "command" without losing either his commission or his office. (Indeed he does not complain of the loss of either.)

If it be true, that a deprivation of *command* was a deprivation of *office*, what became of the officers, some hundreds in number, counting the major and brigadier generals and colonels, who were in *office* and in *command* prior to the acts of 1846 and 1847, and to whom no command was or could be assigned under these acts? If the relator's position is correct, they were at once removed from their offices. They were removed, too, by the act of the legislature merely. The constitution had provided (§ 4 *of art.* 4 *of Const. of* 1821, *and* § 5 *of art.* 11 *of Const. of* 1846, *in the same words precisely,*) that no commissioned officer should be removed from office, unless by the senate on the recommendation of the governor, stating the grounds on which such removal is recommended, or by the decision of a court martial pursuant to law. If each of the officers thus deprived of his command was in reality deprived of his office, as must be the case, if the relator's ground is well taken, then I entertain no doubt that the acts of 1846 and 1847, which wrought

such consequences, and under which alone the relator claims, were unconstitutional and void. Of course, in that event, the relator could have no assistance from this court in obtaining the command of which he is in pursuit. That the legislature intended no such result as this, is abundantly obvious from the 21st section of the act of 1847, which provides that "all commissioned officers rendered supernumerary by the provisions of this act, shall be entitled to all the privileges conferred by any preceding law (*except command,*) and shall be exempt from the performance of any military duty, except in cases of war and insurrection, provided they shall within one year report themselves to the adjutant general as such." The same provision, substantially, is contained in § 24 of article 1, of title 4 of the act of April 17, 1854, in relation to the militia, (*Laws of* 1854, *ch.* 398, *pp.* 1015, 1031,) as well as in § 3 of chapter 307 of 1849. The same power to remove from command, without removing from office, is clearly recognized in the provisions of 1 *R. S.* 294, §§ 6, 7, though the power is there carried so far as almost to amount in many cases to an absolute removal from office.

It was said by the learned judge in the court below, that the commission to the defendant, if valid, in effect removed the relator from the office of brigadier general of his brigade; that there was but little difference between removing an officer, and *permanently* depriving him of his powers. That may be so, as to civil officers. But is it equally true of military officers? And if it be so, is the deprivation of command, a *permanent* deprivation of the powers of a military officer? In my opinion, this cannot be true of the relator. He is, by the express provisions of law, still entitled to all the privileges of his office, *except command.* He still retains his commission. The same authority, that has now deprived him of the command, and attempted, whether rightfully or not, to confer it on the defendant, may, at any time, restore it to the relator, if the brigade district is not yet fully organized. Would such an order, if now made, be a reappointment to office, or would it be merely imposing new duties on one formerely appointed to an

The People *v.* Scrugham.

office, and still continuing to hold it, though temporarily deprived of his " command ?" Certainly the principle that command is essential to the very existence of a military office, cannot apply to forces in actual service, as to the army or navy of the United States, or to our own militia in the field during a war. It has never been dreamed that the head of a military force may not select his own officers for the arduous duties required of them, and on account of their personal fitness therefor. This power to select, implies the power to give place to the person selected, not necessarily, or even commonly, by displacing from office, but from the command. If the colonel of one of the regiments in the army of the United States, is found to be incapacitated for command, for any cause, whether sufficient for removal from office, or not, the head of that army could undoubtedly take from him the active command, and give it to another officer. The pay of the colonel would, in such case, continue, with all the other privileges of his rank, till, on a regular trial, he had been deprived of his commission and his office. Or, if the incapacity is subsequently found to be removed, he may be restored to his command, simply by an order, similar to that which deprived him of it. The same principle is, and necessarily must be, applicable to the navy, whether the command of a squadron or a ship, or any less important duty be concerned. Upon principle, the same rule must apply to the militia of the state in time of peace. No one will doubt that it applies to them during a war, or when in active service.

The relator, then, has not been "*permanently*" deprived of his powers. He has lost his command, but may receive it again at any moment. But, in my judgment, such an officer may lose his command forever, without being deprived of his office, or infringing the constitution. No one can doubt the power of the legislature to alter, either by increasing or diminishing, the number of the regimental, brigade or division districts of the state. The learned judge at the special term admits the existence of this power. The relator's whole case stands upon it. For without it the act of 1847, under which he claims, is void. But by such an alteration some officers will

be deprived of actual command. They will, however, still re-tain their offices, and all the privileges attached thereto, except command. If on the organization of the new regiment, brigade or division, the command is transferred to the officer duly elected or appointed to the command thereof, pursuant to the consti-tution and laws, no one can believe that the constitution is violated, or that vested rights of the officers rendered supernu-merary, are invaded.

As has been already stated, when the relator was elected to office in 1841, his brigade was by law (1 *R. S.* 294, § 2) liable to be annexed to or consolidated with any other or others in the state, at the mere pleasure of the commander-in-chief. He might, by such action, have been at any time rendered super-numerary. He assumed his office with that contingency directly in view. The command of the new brigade which would thus have been created, could certainly have passed to the proper officer, whether appointed by the commander-in-chief or elected by the brigade, without impairing either the constitution or the relator's rights. By the statute he would have retained his commission and his rank, and all the privi-leges of his office, notwithstanding the loss of his command. So, I think, it will appear he has done in the present case, not-withstanding the defendant's appointment. And it can make no difference that the relator was rendered supernumerary, not by the mere act of the commander-in-chief alone, as contem-plated by the revised statutes, but by the provisions of a law which the commander-in-chief, as governor, united with the leg-islature in enacting, and his acts under that law. By the act of 1847, therefore, the relator was merely detailed for the performance of a particular duty in organizing the new brigade. He had, so to speak, no property in it. He was not its regular, elected, permanent commander. The constitution had secured to the brigade the right of electing for themselves that officer. Upon his election, as provided by section 20 of the act, the or-ganization of the brigade would, except the mere form of com-missioning the officers, be complete. If the relator had been thus elected, he would have received a new commission. (§ 23.)

The People v. Scrugham.

Had another person been elected, the relator would have been rendered a supernumerary. He would have been relieved of the burden of performing military duty, but would still have retained his commission, and all the privileges of his office, except actual command. I do not see that in that case he could ever regain a command, except by a change of the law, or a new election to office. It would seem, however, that the duties thus imposed upon the relator and other officers who stood in a similar position under the act of 1847, were not satisfactorily performed. For on the 10th of April, 1849, another act was passed, " making further provision for the organization of the militia," &c. (Laws of 1849, p. 438, ch. 307.) The constitution had provided (Art. 11, § 6) that in case the mode of election and appointment of militia officers thereby directed, should not be found conducive to the improvement of the militia, the legislature might abolish the same, and provide by law for their appointment and removal, if two-thirds of the members present in each house should concur therein. The act of 1849 was passed in that manner. By section 1 of this act, the commander-in-chief was authorized and empowered, if, in his opinion, the public service should require it, to assign the command of any of the military, brigade or regimental districts, to any brigadier general or colonel residing therein, without regard to rank. This provision virtually repealed section 5 of the act of 1847, which required that such command should be assigned by the commander-in-chief to the brigadier general residing in the district, highest in rank, who was in command on the 1st of November, 1846, and who had rendered the services specified in the act. The relator had received the command under the latter provision of law, and its repeal left him to depend for the continuance of that command solely upon the pleasure of the commander-in-chief. There are many other provisions of the act of 1849, looking to the speedy reorganization of the militia, which it is unnecessary here to notice. But it will be observed that the legislature, in this act, treat the former officers as still in office, and authorized to exercise all its functions, though they had been previously deprived of their command, under the

acts of 1846 and 1847. The act also speaks of *assigning the command* to an officer, as something entirely distinct from appointing him to office. Notwithstanding the provisions of this act, the enrollment of the militia of the state appears still to have remained incomplete. On the 16th of April, 1851, another act was passed, also by a two-thirds vote, "For the enrollment of the militia," and for other purposes. (*Laws of 1851, ch.* 180, *p.* 307.) By its first section, the commander-in-chief was authorized and empowered to appoint and commission the brigade, regimental and company officers, *necessary to complete the organization of all military districts not then organized.* A provision substantially similar is contained in section 43 of title 2 of the act of April 17, 1854. (*Laws of* 1854, *chap.* 398, *pp.* 1015, 1023.) That section is in these words: " The commander-in-chief is hereby authorized and empowered to appoint and commission the brigade, regimental and company officers necessary to facilitate the organization of all military districts *not now sufficiently organized to authorize an election.* ` All officers superseded by such appointment shall become supernumerary officers." This act is stated in the session laws to have been passed, " three-fifths being present." It is, in my judgment, unnecessary to inquire whether two-thirds of the members present in each house concurred in the passage of this act, as required by section 6 of article 11 of the constitution. For the same authority which section 43 of this act confers, had been previously conferred by the statutes above cited, which were passed in the manner prescribed by this provision of the constitution. But upon reference to the journals of the legislature, to which it is now well settled that we may look, it appears that this law was passed by the concurrent votes of more than two-thirds of the members present in each house. (*See Assembly Journal of* 1854, *p.* 757 ; *Senate Journal, p.* 840.) It should be observed, however, that none of these acts purports or proposes to "abolish" the mode of election and appointment of militia officers directed in the constitution, and to provide a different system for their appointment and removal. On the contrary, all these statutes preserve, in express terms, the con-

The People v. Scrugham.

stitutional method of election and appointment. (*See act of* 1854, *tit.* 2, §§ 1 *and* 5, *pp.* 1016, 1017.) The provisions of the statutes above cited all relate to the appointment or selection of officers who are to be charged with a mere temporary function in reorganizing the militia, and preparing it for the due election of its own permanent officers, in the mode pointed out in the constitution.

It is true that certain provisions of the act of 1854, clearly confer on the commander-in-chief the power to appoint and commission the brigade, regimental and company officers, necessary to facilitate the organization of all the military districts, not then sufficiently organized to authorize an election. (*Title* 2, § 43, *p.* 1023.) And the officers thus appointed are not to be superseded by an election. (*Title* 4, *art.* 1, §§ 22, 23, *pp.* 1034, 1035.) As the validity of the defendant's appointment does not come in question in this case, it is not necessary to express any opinion as to the validity of this latter provision, dispensing with an election in a case where an appointment has been made. Although it would seem that, as the greater includes the less, if the legislature, by an enactment passed in a certain manner, may abolish one system entirely, and provide a different system in its stead, they may by an enactment, passed in the proper manner, change the existing system only in certain parts, or to a limited extent, or for a temporary period. But I entertain no doubt that, either under this act or the act of 1851, the governor might confer on the defendant such powers as were necessary to facilitate the organization of the seventh brigade, if it were not sufficiently organized to authorize an election.

In his answer in this case the defendant avers that the 7th brigade district, (which appears from the whole case to have been under the command of the relator up to the time of the defendant's appointment,) "was not, at any time on or before the 17th day of April, 1854, and has never since been, sufficiently organized to authorize the election of a brigadier general, and that on the 5th of May, 1855, the said brigade district was not sufficiently organized to authorize an election, and that the appointment of a brigadier general of the seventh brigade,

then partially formed therein, was necessary to facilitate the organization of such district." In my judgment, all these are material and traversable allegations of fact, and as such are admitted by the demurrer to be true. As to the first two, viz: the fact that when the law of 1854 was passed, and when the defendant was appointed, there was not a sufficient organization in the district to authorize the election of a brigadier general, there is, it seems to me, no room for doubt. The acts of 1851 and 1854 both declare that the governor is to appoint in the districts *not then organized.* All other districts not included in this description are of course excluded from the power. Whether the seventh brigade district was or was not within the description in the statutes, is a simple question of fact. The existence or the absence of an organization in the district sufficient to authorize an election, is as capable of proof as any other fact; and it may as properly be asserted in the words of the law, as to set forth in detail the separate steps which constitute the organization. The third of these averments, viz: the necessity for the appointment of a brigadier general in the district to facilitate its organization, was, I think, also a proper question of fact, though it does not at first view seem to admit of quite the same degree of ease in proving or disproving it. But that necessity was committed by the legislature to the commander-in-chief. The exercise by him of the power of appointment, conferred by the statute upon him in case there should, in his opinion, be a necessity for the use of the power, would probably be conclusive evidence of the existence of that necessity, in every court and tribunal.

But it is said this averment, that the brigade was not organized, is the mere allegation of an inference or conclusion, without setting forth the facts on which it is founded, and is therefore insufficient. I cannot concur in this view. The want of an organization is the precise fact which the statute declares shall give the commander-in-chief power to appoint. The pleader has stated all that was necessary, in stating that fact. The allegation will be sustained by showing that the brigade had not been divided into regimental or company districts, as

The People *v.* Scrugham.

required by sections 5 and 6 of the act of 1847, or that six companies had not been organized in any regimental district, or had not elected their officers, or that the officers of such companies, if formed, had not elected their regimental officers, or that the field officers of the regiments had not elected their brigadier general and brigade inspector, according to the provisions of sections 7–20 of the same act. To have averred these several particulars, or any of them, would have been merely pleading the evidence. The defendant has averred the fact that no sufficient organization existed in the brigade to warrant an election for brigadier general. If that is denied, he will establish it by the proof of either of the matters referred to, in which the statutory requirements have not yet been complied with. It would have been improper to fill the answer with the details of this evidence.

Nor can I see that there is any presumption that the regiments and companies of the relator's brigade were duly officered. The statutes for the period between 1847 and 1854 are constantly asserting the fact that many military districts are not organized, and as constantly making new provisions for their organization. It is obvious that the relator's brigade had not fully completed its organization, prior to the passage of the act of 1854. For if it had, it would have elected its own brigadier general, who would then have assumed the command, and excluded both these gentlemen therefrom. Whatever might be the presumption as to a completed military system, that the regiments and companies were duly officered, certainly no such presumption exists in reference to the imperfect system which is gradually growing up to take the place of that abolished by the acts of 1846 and 1847. The allegation of the defendant's answer is then, in substance, an allegation that the relator's brigade was not duly officered, and that fact stands admitted by the demurrer.

It also appears that on the 5th of May, 1855, the commander-in-chief appointed and commissioned the defendant as brigadier general of the seventh brigade. Of this appointment, as such, certainly the relator cannot complain. It does not affect

or purport to affect him in any manner. The commission to the defendant does not state that he is appointed in the place or stead of the relator, nor make any allusion to him whatever. It does not, in terms, or by any provision of law, operate as a supersedeas of the relator. Whether the appointment is valid or void, the relator retains his office, with all its privileges, the command included. The office of brigadier general is not like that of sheriff or county clerk, of which there can be but a single incumbent, for clearly several such officers may co-exist in the same district, though only one can have the actual command.

It is true the defendant was commissioned as brigadier general of the seventh brigade, and the relator was then in command of that brigade. But the commission to the defendant did not give him the command of the brigade, nor did the relator hold the command by virtue of his commission. He was elected and commissioned as the general, not of the seventh, but of the fifteenth brigade. All his powers over the seventh brigade were derived from the 5th section of the act of May 13, 1847, and the general orders of June 9, 1847, which, pursuant to that section, assigned to him the command. This section, as already stated, is in effect repealed by section 1 of the act of April 10, 1849. By this enactment, if, in the opinion of the commander-in-chief, the public service should require it, the command of the seventh brigade, which, by the former act, was absolutely secured to the relator, might be assigned to any brigadier general or colonel residing in the district. The defendant was, previous to his appointment as brigadier general, a colonel residing within the seventh brigade district. Even if the defendant's appointment as general were invalid, still the command of the brigade, so far as it is disposed of under any of these statutes, this temporary function in reorganizing the brigade, might have been assigned to him as a colonel, by the commander-in-chief, under sec. 1 of the act of April 10, 1849; and in order to retain absolutely the command of this brigade, the relator must prove this provision of the statute of 1849 to be unconstitutional and void. Although it seems now to be thought

the principal duty of the courts to declare laws unconstitutional and void, I imagine it will hardly be contended that this section is such; certainly the learned counsel for the relator did not assume any such position upon the argument.

If then the relator cannot complain of the appointment and commissioning of the defendant, what is the real and precise ground of his present proceeding? His own allegations do not state it with much distinctness, and hence, probably, has arisen most of the difficulty of the case. But the defendant's return discloses the point with entire certainty. On the 5th of May, 1855, the day of the defendant's appointment, the commander-in-chief issued an order in the following terms:

"STATE OF NEW YORK, HEAD QUARTERS.

ADJUTANT GENERAL'S OFFICE,
Albany, May 5, 1855.

*General Orders No.* 17.

It is hereby ordered that so much of the general orders of June 9th, 1847, as assigned the command of the seventh brigade N. Y. S. M., to Brigadier General Munson I. Lockwood, be and the same is hereby countermanded.

William W. Scrugham having been duly appointed and commissioned as brigadier general, will assume the command of said brigade, and the officers attached to the several regiments composing the same will report to him for duty. Brigadier general William W. Scrugham is charged with the duty of promulgating this order.

By order of the Commander-in-Chief.

ROBT. H. PRUYN, Adj't Gen'l."

This is the grievance of which the relator asks us to take cognizance. He derived his command of the brigade in question from a general order of his commander-in-chief. He has lost that command by another order of the same officer. He asks this court to restore to him what he has thus lost; and to do so by means of a peremptory mandamus directed to the defendant, enjoining him to permit the relator to exercise the office of brigadier general, without interruption or intrusion from the defendant.

There are several conclusive answers to such an application. One is, as was suggested at the commencement, that the judgment asked for will certainly subject the defendant to punishment, either from this court, or from his military superiors. For, unless he has the power of serving at the same time two masters who give contradictory commands, he must disobey either one or the other, and will be dealt with accordingly. Another answer is, that if the defendant is enjoined, as the relator desires, it will not restore the relator to his command. That will require something more than the acts or omissions of the defendant or of this court. Still another answer might be that the last order of the commander-in-chief, depriving the relator of his command, is right, and is well warranted by the laws and the constitution. So it certainly is, in my judgment. But I prefer to put my decision of this case upon still another ground. I, for one, disclaim any power whatever to review this order of the commander-in-chief, or to pass upon its validity. The governor, as the commander-in-chief of the militia, is made the supreme head of the military forces of the state. The relator and every other subordinate officer is dependent on him, and owes obedience to him. The constitution and laws have reposed such confidence in him, as to make him the ultimate judge of every disputed election in the militia of the state. We can no more review his orders to his subordinates, in relation to the military affairs committed to his discretion, as was the matter of which the relator complains, than we can review his acts in granting pardons or nominating to office. Those orders are as much beyond our revision as are the orders of the president or secretary at war, in reference to the army of the United States. This does not imply that his powers as commander-in-chief are without limit, or that he may make any order he chooses, without reference to right or wrong. If he, or any of his subordinates by his order, shall wrongfully take private property, or invade the liberty, or injure the person of a citizen, this court may doubtless award damages to the injured party against the wrongdoer; and in such an action may pass upon the validity of the governor's orders, when pleaded as a justification of such an act,

But in this proceeding, the order of May 5, 1855, is incapable of review. And as long as that part of it which countermands the order of June 9, 1847, assigning the command of the seventh brigade to the relator, remains operative, the relator cannot exercise the command of this brigade. Whether the defendant can do so or not, is, therefore, wholly immaterial to a decision on the relator's prayer for relief. The relator has been deprived of his command by this order of his superior, not by any act of the defendant. If he can be reinstated in his command at all, he must apply to a tribunal wholly distinct from this.

This conclusion renders it quite unnecessary to express any decisive opinion upon the question whether the governor had the power to appoint and commission the defendant as brigadier general, or whether we can examine that power by the writ of mandamus.

The judgment of the special term must be reversed, and judgment rendered in favor of the defendant, on the demurrer to his return, adjudging the return to be sufficient, and denying a peremptory mandamus.

STRONG, P. J., dissented, for the reasons given by him at the special term. (*See* 20 *Barb.* 302.)

[DUTCHESS GENERAL TERM, April 14, 1857. *S. B. Strong, Birdseye* and *Emott,* Justices.]